676 P.2d 262

**STATE of New Mexico,**
**Plaintiff-Appellee,**

v.

**Willie Charles ANTHONY,**
**Defendant-Appellant.**

**No. 7257.**

Court of Appeals of New Mexico.

Dec. 8, 1983.

Paul Bardacke, Atty. Gen., Marcia E. White, Stephen J. Westheimer, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

Holly A. Hart, Albuquerque, for defendant-appellant.

## OPINION

DONNELLY, Judge.

Defendant was convicted of two counts of disposing of stolen property in violation of NMSA 1978, § 30–16–11 (Cum.Supp. 1983), following a jury trial. The single issue asserted by defendant on appeal is whether the trial court abused its discretion by permitting a polygraph examiner to testify as to the results of a polygraph examination administered to defendant without showing the examiner was properly qualified to conduct the test.

The State does not oppose defendant's claim of error; instead it urges that this Court overrule its prior decisions allowing

polygraph evidence in criminal trials, or alternatively, to adopt appropriate detailed guidelines clarifying the minimum qualifications for polygraph examiners and for the admission of polygraph test results into evidence.

*Facts*

A rifle and a shotgun were stolen in January, 1982, from the residence of Charles Collins in Clovis. Through the testimony of several witnesses the weapons were traced back to the possession of defendant. In June, 1982, the shotgun was recovered when police arrested Johnny Stone for aggravated assault with a firearm. Stone told police that he had purchased the shotgun from defendant earlier in the year, for $15. In September, 1982, police recovered the rifle from Hank Bayless. Bayless testified he had purchased the rifle from Roy Ewing. Roy Ewing testified he had bought the rifle from his brother, George, who had purchased it from Euguene Mathis. Mathis testified that he had given defendant $50 for the rifle in January, 1982.

Defendant denied that he had ever had possession of the shotgun or rifle, or that he had sold the weapons to Mathis or Stone. Defendant's counsel attacked the credibility of Stone and Mathis and elicited that both witnesses had prior felony convictions.

The State, in its case-in-chief, presented the testimony of Nelson Worley, the Police Chief of Clovis. Worley had administered a polygraph examination to the defendant. Worley testified that defendant had voluntarily submitted to the polygraph examination. He stated that during the test defendant had been asked two "relevant" questions: (1) "Did you hock a rifle to Eugene Mathis for $50"; and (2) "Did Eugene Mathis loan you $50 on a rifle?" Worley stated that in his opinion the polygraph charts conclusively demonstrated that defendant's negative responses to both of the questions were deceptive.

Prior to tendering Worley as an expert polygrapher, the State established that he was a high school graduate, that he attended the Baxter School of Lie Detection in New York City from May 21, 1973 to June 30, 1973, that he completed a field project in May, 1974, and that he had attended at least one polygraph seminar a year since 1974. Additionally, the State established that Worley was a member of several polygraph associations and had administered polygraph tests to 662 people. On *voir dire* Worley admitted that he had no training in the field of psychology or physiology except for that received in the course of his polygraph training, and opined that a background in psychology or physiology was not needed for adequate training.

Worley acknowledged that throughout the examination, defendant suffered from an eye irritation with pain and that an individual's physical condition, or the experiencing of pain could affect the responses recorded by the machine thereby distorting the test results. Worley stated that in his opinion, however, defendant's eye problem did not influence the test results to any significant degree.

The trial court, over defendant's objections, recognized Worley as an expert polygrapher and permitted him to state his opinion as to the results of the polygraph test. Defendant argued that Worley had an inadequate background in psychology and physiology to properly determine the effect of defendant's eye problem on the polygraph test. At trial, the State argued it was not a requisite that an examiner have training in the fields of psychology or physiology, and the necessity for such background should be left to the discretion of the trial court. The trial court ruled that it did not find any cases in New Mexico that precluded a polygrapher from testifying where physical or psychological problems were shown to exist in the tested subject.

*Qualifications of Polygraph Examiner*

Defendant contends the trial court failed to exercise its discretion as to the admissibility of the polygraph testimony as it was required to do under *State v. Bell*, 90 N.M. 134, 560 P.2d 925 (1977) and *State v. Brionez*, 91 N.M. 290, 573 P.2d 224 (Ct.App.), *cert. denied*, 91 N.M. 249, 572 P.2d 1257 (1977). The State concedes that the court

erred in permitting Worley to testify as to the results of the polygraph examination upon defendant. The State further argues that New Mexico should preclude evidence of polygraph tests in conformity with the decisions of other jurisdictions, or restrict its admissibility to cases where both parties have stipulated to its admission. We do not address these contentions since the New Mexico Supreme Court has expressly determined that polygraph evidence is sufficiently reliable to be admissible as evidence in court. *See State v. Bell; State v. Dorsey*, 88 N.M. 184, 539 P.2d 204 (1975).

In *State v. Bell*, the supreme court noted that polygraph evidence, if relevant, is admissible within the discretion of the trial judge, where there is: (1) evidence of the qualifications of the operator; (2) testimony to establish the reliability of the testing procedure; and (3) evidence demonstrating the validity of the tests made on the subject. 90 N.M. at 138, 560 P.2d at 929. This Court follows the decisional precedent of the supreme court and may not alter such rulings. *Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973). Additionally, our Supreme Court has implicitly reiterated the admissibility of polygraph evidence, in civil and criminal proceedings, by the adoption of Evidence Rule 707.[1]

After the trial in the instant case, the New Mexico Supreme Court amended the rules of evidence to detail the minimum qualifications of polygraph examiners. Evidence Rule 707(b), pertaining to the qualifications of a polygraph examiner provides that:

To be qualified as an expert witness on the truthfulness of a witness, a polygraph examiner must have at least the following minimum qualifications:

(1) at least five years experience in administration or interpretation of polygraph examinations or equivalent academic training;

(2) conducted or reviewed the examination in accordance with the provisions of this rule; and

(3) successfully completed at least twenty hours of continuing education in the field of polygraph examinations during the twelve month period immediately prior to the date of the examination.[2]

Under Evidence Rule 707(c), the opinion of a polygraph examiner, may, in the discretion of the trial judge, be admitted as evidence as to the truthfulness of any person called as a witness, if the examination was performed by a person who is qualified as an expert polygraph examiner, and if:

(1) the polygraph examination was conducted in accordance with the provisions of this rule;

(2) the polygraph examination was quantitatively scored in a manner that is

---

1. NMSA 1978, Evid.R. 707 (Repl.Pamp.1983) was adopted effective June 1, 1983. Three different approaches have been taken in regard to the use of polygraph evidence in criminal trials: (a) New Mexico is the only jurisdiction that admits testimony concerning the results of polygraph examinations in judicial proceedings in the absence of a stipulation to its admissibility by both parties. *See Simon Neustadt Fam. Ctr. v. Bludworth*, 97 N.M. 500, 505, 641 P.2d 531, 536 (Ct.App.1982); *see also* Kenety, *The Psychological Stress Evaluator: The Theory, Validity and Legal Status of an Innovative "Lie Detector"*, 55 Ind.L.J. 349, 353 (1980); *but see Wynn v. State*, 423 So.2d 294 (Ala.Cr.App.1982); (b) The majority of jurisdictions refuse to admit evidence of polygraph examinations in the absence of a stipulation by both parties. *See e.g. State v. Marti*, 290 N.W.2d 570 (Iowa 1980); *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962); *Wynn v. State; People v. Trujillo*, 67 Cal.App.3d 547, 136 Cal.Rptr. 672 (1977); *see also State v. Blosser*, 221 Kan. 59, 558 P.2d 105 (1976); *McLe-*

*more v. State*, 87 Wis.2d 739, 275 N.W.2d 692 (1979); Annot., 53 A.L.R.3d 1005 (1973); (c) Some courts have adopted the more stringent rule that evidence of polygraph results is inadmissible per se. *See People v. Anderson*, 637 P.2d 354 (Colo.1981); *People v. Baynes*, 88 Ill.2d 225, 58 Ill.Dec. 819, 430 N.E.2d 1070 (1981); *State v. Antone*, 62 Haw. 346, 615 P.2d 101 (1980); *Pulakis v. State*, 476 P.2d 474 (Alaska 1970).

2. A polygraph machine is a device which measures and records the changes in the examinee's blood pressure or pulse rate, respiration rate and depth, and galvanic skin resistance while undergoing questioning. The theory underlying the use of such devices is that if an individual consciously responds untruthfully to questioning, the machine will detect physiological indications revealing a deceptive answer. *State v. Dorsey; see also State v. Blosser; Commonwealth v. A. Juvenile (No. 1)*, 365 Mass. 421, 313 N.E.2d 120 (1974).

generally accepted as reliable by polygraph experts;

(3) prior to conducting the polygraph examination the polygraph examiner was informed as to the examinee's background, health, education and other relevant information;

(4) at least two relevant questions were asked during the examination; and

(5) at least three charts were taken of the examinee.

Evidence Rule 707(c).

Evidence Rule 707(f) requires the trial court to make a determination as to the admissibility of a polygraph examination outside the presence of the jury. In the instant case the witness was qualified in the presence of the jury without objection by defense counsel.

Prior to the adoption of Evidence Rule 707, the requirements for recognition as an expert polygrapher were contained in court decisions. *See State v. Dorsey; State v. Fuentes,* 91 N.M. 554, 577 P.2d 452 (Ct. App.), *cert. denied,* 91 N.M. 610, 577 P.2d 1256 (1978); *State v. Brionez; State v. Alderete,* 86 N.M. 176, 521 P.2d 138 (Ct. App.1974). With the adoption of Evidence Rule 707, however, the minimum requirements for qualification as an expert in the field of polygraphy and the guidelines by which such tests are conducted, provide standards instructive to the case at bar.

By statute, polygraph examiners in New Mexico are required to be licensed. NMSA 1978, §§ 61–26–1 through 61–26–13 (Repl. Pamp.1983). The Polygraphy Act, however, does not contain qualifications sufficient to meet the test (*see* the requirements of *State v. Bell* ) under contemplation. *State v. Alderete.* As recognized by Evidence Rule 707(c), polygraph examinations, even when conducted by persons who have met the minimum requirements for licensure, or have been previously recognized as experts in other cases may, nevertheless, be subject to distortion due to a number of factors. Several court decisions have examined these factors in detail.

In *People v. Berry,* 118 Cal.App.3d 122, 173 Cal.Rptr. 137, *cert. denied,* 454 U.S. 966, 102 S.Ct. 508, 70 L.Ed.2d 382 (1981), it was acknowledged that:

[A]mong the factors that can adversely affect the reliability of the polygraph test are the emotional upset of the subject, fatigue, drunkenness, drugs, bad physical or emotional condition, high blood pressure, low blood pressure, hardening of the arteries, obesity, feeblemindedness, amnesia, a psychotic condition, being a pathologic liar, lack of fear or concern at being caught in a lie, surreptitious nervous simulation, use of antiperspirants, hypnosis, extraneous noise or abnormal temperatures.

118 Cal.App.3d at 134, 173 Cal.Rptr. at 143. The court in *Berry* also observed that the more times a person is tested, the less reliable the results, and the accuracy of the test can be affected by whether the testimony is conducted by a "friendly" or "hostile" examiner. *Id.*

Polygraph experts admit that a subject's state of mind and physical condition are variables that can alter the responses measured by the polygraph. *See People v. Anderson,* 637 P.2d at 359, citing J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie-Detector") Technique* 215–53 (2d ed. 1977) (hereinafter cited as Reid & Inbau). Because of the many variables which can affect the accuracy of such tests, it has been stated that the "most important factor in the proper use of a polygraph is the ability, experience, education, and integrity of the examiner." *State v. Alderete,* 86 N.M. at 179, 521 P.2d at 141 (Wood, J., concurring); *People v. Anderson,* 637 P.2d at 360, citing Reid & Inbau at 304. *See also* Comment, *The Courtroom Status of the Polygraph,* 14 Akron L.Rev. 133 (Summer, 1980).

Emphasizing the key role played by the polygraph examiner, the court in *Com. v. Vitello,* 376 Mass. 426, 381 N.E.2d 582 (1978) stated:

First, the polygraph machine and the recordings it produces are merely tools in the hands of the examiner; the machine is not independently capable of discerning truth from deception.... Even the most avid supporters of the polygraph would likely agree that while "[v]alidity

is greater than for any other psychological technique ... it must be recognized that accuracy is almost totally dependent upon the skill of the polygraphist."
376 Mass. at 438–39, 381 N.E.2d at 590, quoting from Abrams, *Polygraph Today*, 3 Nat'l J.Crim.Def. 85, 105 (1977).

 Recognition of a polygraph examiner as an expert must, therefore, be made only after all the pertinent factors which may affect the test have been studied and the qualifications of the polygraph examiner carefully scrutinized. The trial court has considerable, but not unrestrained discretion.

Even though a polygraph examiner is licensed, and possesses the minimum qualifications under Evidence Rule 707, a showing that a mental or physical condition exists in the examinee at the time of the test requires an additional showing that the polygraph examiner had the proper expertise to evaluate the effect of this condition on the examinee. In *State v. Fuentes*, for example, the trial court excluded evidence sought to be presented concerning the results of a polygraph administered to a defendant. The court stated that an examinee may be unfit for polygraph testing due to a physical or mental problem. The examiner, in turn, must be qualified to determine whether the examinee is a fit subject for testing. *State v. Fuentes*, 91 N.M. at 556, 577 P.2d at 454. *Compare State v. Gallegos*, 92 N.M. 370, 588 P.2d 1045 (Ct. App.1978) (examiner, prior to testing, asked numerous questions directed to defendant's physical condition).

Polygraph evidence is not admissible if the examiner is not qualified, if the examinee is not a proper subject for testing, or if the test was not conducted under proper conditions. *See* Evid.R. 707(c).

The accuracy of the examinations may also be influenced by the manner in which the pre-test interview is conducted, or the method by which the "control" questions and the "relevant" questions are formulated and propounded.[3] Evidence Rule 707(e),

requires that both the examination and pretest interview be recorded. *Compare State v. Beachum*, 97 N.M. 682, 689, 643 P.2d 246, 253 (Ct.App.1981), (involving witnesses who have undergone hypnosis). Experts are virtually unanimous that unless the "relevant" questions are carefully formulated, the test results are suspect. A relevant question means a "clear and concise question which refers to specific objective facts directly related to the purpose of the examination and does not allow rationalization in the answer." Evidence Rule 707(a)(4). *See also State v. Brionez*, 91 N.M. at 295, 573 P.2d at 229. The "relevant" questions propounded to defendant herein, were ambiguous in nature. When tested by the requirements of Evidence Rule 707(a)(4), they fail to meet the standards imposed.

As conceded by the State, the examiner was not qualified to determine the possible effect of defendant's admitted physical problem on the test results. In light of defendant's physical condition at the time of the test, the lack of qualifications by the examiner to properly evaluate the effect of such condition upon the test results, and the ambiguous nature of the relevant questions, it was error to admit the examiner's opinion. *See Simon Neustadt Fam. Ctr. v. Bludworth*, wherein the trial court refused to recognize an individual with four years experience as an expert operator of a voice stress machine where he had no training in psychology or medicine and could not determine if a person was psychologically fit to take a test. *See also State v. Fuentes.*

Defendant's convictions are reversed and the case is remanded for a new trial.

IT IS SO ORDERED.

WALTERS, C.J., and WOOD, J., concur.

---

**3.** As observed by Reid and Inbau at 24, "[t]he phraseology of the test questions is an extremely important aspect of the examination. The questions, and every word used in the questions, must be unambiguous, unequivocal, and thoroughly understandable to the subject."